**UNITED STATES of America,**

v.

**KENNECOTT COPPER CORPORATION, Defendant.**

United States District Court
S. D. New York.

Dec. 23, 1965.

See also D.C., 231 F.Supp. 95.

Jerome S. Wagshal and Arthur J. Cantor, Dept. of Justice, of counsel, for the Government.

Sullivan & Cromwell, New York City, for defendant, Arthur H. Dean, Howard T. Milman, Richard M. Price, New York City, of counsel.

RYAN, Chief Judge.

This proceeding has been had under paragraph "2" of the final judgment

entered herein on November 24, 1964 which reads:

"2. Defendant Kennecott Copper Corporation is ordered to divest itself of the stock and business of The Okonite Company, the Delaware Corporation, and *to cause the divestiture of such business activities by sale or other means or methods as the Court may hereafter determine and decree as just and equitable, so that the business of the Okonite Company and the parts and divisions thereof shall be reconstituted as an independent corporation capable of existence as a viable business."* *

The proceeding has been initiated by the application of the defendant for judicial approval of an agreement of purchase dated October 15, 1965 between Okonite and Ling-Temco-Vought, Inc. which the defendant maintains and represents "will achieve the antitrust purpose of the Final Judgment in this case and the purposes of Section 7, and also protect the public interest, i. e., the interests of the employees and customers of Okonite, the communities in which Okonite operates, and the public investors in Kennecott, as well as preserve the viability of Okonite as a competitor in the wire and cable industry."

 The government opposes approval of the proposed sale of Okonite to LTV contending that it will not "constitute adequate relief in this case." It argues that its "spin-off" proposal is in fact entitled to a presumption over defendant's proposal of sale. We do not accept this as an accurate statement of the law. With the government's consent to the procedure, this hearing proceeded with the focus of the hearing placed primarily on the defendant's proposal. At the very outset of the hearing, we ruled that the defendant had the burden of proving that the sale of Okonite to LTV provided in the purchase agreement will be just and equitable, and will reconstitute Okonite as an independent corporation capable of existence as a viable business and in accord with the antitrust provisions and purposes of the final judgment. While, of course, we must weigh and determine the reasonably probable result of all possible means of divestiture, no one plan is graced with a presumption as to its merits. This brings us then to the contract or agreement of purchase now submitted to us for approval.

The Purchase Agreement in substance provides for the acquisition by LTV, or a subsidiary designated by LTV, of substantially all of the assets, business and goodwill of Okonite (including the Kennecott Wire & Cable Division) for a cash consideration, and the assumption of cer-

---

* We have noted in this proceeding that "Well, my idea * * * when I used the term 'independent' * * * was it should be independent of Kennecott financing as far as possible, independent of Kennecott management as far as possible, if not entirely. That is the concept I had at the time 'independent' was used with relation to the divested company." (S.M. p. 23)

This observation conformed with the ruling made at the time of the preparation and entry of the final judgment, when the Court ruled

" * * * (A)fter the word 'cause,' I would insert the following: 'the divestiture of such business activities by sale or other means or methods as the Court may hereafter determine and decree as just and equitable, so that the business of the Okonite Company and the parts and divisions thereof shall be reconstitut-

ed as an independent corporation capable of existence as a viable business.'

"In other words, the essential change that I would make would be to strike out 'publicly owned', and I would insert that the divestiture might be accomplished by sale or other means or methods.

"By that I would mean that to reconstitute a separate, independent company, you might spin off the stock—I don't know yet—or you might sell the stock as a secondary offering, or you might sell the business as a package to somebody for cash, and I would not at this time preclude the defendant from electing either one of those methods or some other fair and equitable method which would accomplish the divestiture of management and control and ownership that we desire to accomplish." (S.M. pp. 12 and 13, of November 12, 1964).

tain liabilities and obligations of Okonite by LTV, subject, among other things, to an appropriate order of this Court. The consideration to be paid by LTV (or a designated subsidiary) is approximately $30,000,000—$25,000,000 to be paid in cash to Kennecott, plus the assumption or payment by LTV of approximately $5,000,000 of Okonite's long term indebtedness to The Mutual Benefit Life Insurance Company, which loan had been outstanding when Kennecott acquired Okonite in 1958. It also contains a provision, which we are told LTV insisted upon, for the supply of copper by Kennecott, whereby Kennecott has agreed to sell LTV, at the latter's option, the following quantities of copper per year: 33,500 tons in 1966, 36,000 tons in 1967, and 37,500 tons each in 1968 and 1969 (Tr. 144–145a: DX 1, Annex B).

It has been recognized by the parties that the divestiture decreed might be accomplished by one of two means or methods: by the distribution of the stock of "Okonite" or of a successor corporation to the stockholders of Kennecott (called by Government counsel a "spin-off"), or by sale of the stock or of the assets and business to a third party. Concerning the choice of these means and details of method to be employed, the government position was "the Court should first have an opportunity to consider a specific plan of divestiture submitted by the defendant." After the Supreme Court had granted the government's motion to affirm (on June 1, 1965, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692), plaintiff submitted a proposed plan of divestiture to accomplish the remedies directed in the final judgment. The plaintiff then recommended (in July, 1965) that "defendant be required to spin-off Okonite as a separate corporation under the supervision of a trustee appointed by the Court", and "that defendant be required to take several steps designed to give Okonite a fair start as an independent company."

As to the sale of Okonite to a third party, the government commented:

" * * * If a sale could be effected to a party acceptable from an antitrust viewpoint, and acceptable to defendant from its point of view, we would of course have no objection. However, defendant has so far not found a single eligible buyer, and it has had over eleven months to do so. Defense counsel has admitted, 'We have been hard at work, we have been talking to people, and we have been trying to find out how we could best dispose of this plant. It is a tough job.' "

Nevertheless, the defendant has after more than a year's activity, which included the employment of a recognized, reliable and experienced firm of investment consultants, produced a purchaser in Ling-Temco-Vought, Inc. which is ready, able and willing to purchase the assets and mark of Okonite at a price of $30,000,000, and to operate it as a separate, viable subsidiary entirely and completely divorced from Kennecott as to management, control and financial dependency. The government opposes the approval of this sale and asks that a "spin-off" be decreed upon nebulous, uncertain and indefinite terms which would require years of judicial supervision, and in addition would be the launching of a new venture, faced with every probability, if not strong certainty, of financial disaster or complete liquidation.

The pre-trial order entered in this action included the stipulation of the parties that "relevant lines of commerce for purposes of the litigation (a) insulated wire and cable and (b) refined copper."

All the findings of Judge Dawson (which I accepted after examination and review of the Court file and the trial testimony and exhibits prior to the entry of final judgment) are of course in the record before us. It was found specifically that

"Before the acquisition of Okonite, Kennecott, Phelps Dodge and Anaconda were dominent in copper production, and Kennecott was the only one of these major producers which relied upon independent fa-

bricators for a substantial part of its copper sales. Phelps Dodge and Anaconda were expanding their fabricating capacity. Kennecott feared that the independent fabricating companies would sell out to copper producers or switch into other kinds of business. Therefore Kennecott bought Okonite to preserve a market for its copper."

The present Okonite Company consists of the original Okonite Company (which, when acquired by Kennecott on November 24, 1958, "was this country's second largest independent wire and cable fabricator") and Kennecott's own separate subsidiary in that field, Kennecott Wire and Cable Company (which in 1958 accounted for about 2% of wire and cable sales and then consumed about 10% of Kennecott's shipments to wire and cable companies). The entire assets and business of this subsidiary were transferred to Okonite about a month after Okonite was acquired by Kennecott.

The legality of Kennecott's acquisition of Okonite was weighed at trial against the government's claim that it violated Section 7 of the Clayton Act; it was found that it did and it was concluded that "the effect of Kennecott's acquisition of Okonite may be substantially to lessen competition in the line of commerce of paper insulated power cable" and "refined copper in the United States in violation of Section 7 of the Clayton Act."

The evaluation in this proceeding of the agreement of purchase brings us first to look at the present corporate structure and business of LTV and Okonite.

■ LTV produces no copper, and manufacturers no wire or cable; it operates in lines of commerce wholly different from Okonite. LTV is primarily in the business of supplying aircraft, missiles, space vehicles and related electronic equipment to the government.

LTV functions through three 90% owned subsidiaries: LTV Aerospace Corporation, which manufactures aircraft, missiles and space vehicles; LTV Electrosystems, Inc., which designs and manufactures airborne electronic gear and electronic components for missiles, and overhauls and renovates military aircraft; and LTV Ling Altec, Inc., which is a producer of commercial and theatre sound systems, and testing equipment for prime government contractors.

LTV is "one of the nation's largest defense-space contractors." Its sales have grown in the last eight years from about $4 million to about $323 million; its assets, from about $3 million to about $127 million. This expansion has followed mergers and acquisitions.

LTV's 1964 consolidated sales were distributed approximately as follows: aeronautics—38%; electronics—32%; missiles and space—29%; other products and services—1%. Approximately 92.5% of LTV's consolidated sales in 1964 and 1965 were made under prime contracts with the United States Government or under subcontracts with other prime contractors (Tr. 240–241, DX 3, DX 5). The 1964 figures were: 99.9% for LTV Aerospace Corporation, 100% for LTV Electrosystems, Inc., and 30.1% for LTV Ling Altec, Inc.

■ For the past three years, LTV's sales have averaged $325 million per year (DX 3). During that period it earned an average of about 22% on its stockholders' investment after taxes (DX 3). We find that it has the financial and top level management capabilities necessary to purchase Okonite for cash, and thus sever all financial and management ties with Kennecott and to also maintain Okonite as a viable competitor. Plaintiff does not dispute that "LTV can maintain and support Okonite as a separate subsidiary or division with its own funds without further help from Kennecott."

The plants of LTV's three subsidiaries, LTV Aerospace Corporation, LTV Electrosystems, Inc., and LTV Ling Altec, Inc., are operated independently. Although more than three-fourths of its operations are concentrated in the Dallas,

Texas area where LTV is headquartered, its plants and offices are spread about the continent from Winchester, Mass. to Anaheim, Calif., and there are LTV offices in Europe and Asia.

Okonite manufactures a broad range of insulated copper wire and cable, as well as some bare wire. About 77% of Okonite's 1964 sales of insulated wire and cable were of "power wire and cable" and its bare wire is also sold for "electrical transmission". Okonite's principal customers are the electric utilities and contractors and industrial firms involved in the construction of plants and buildings.

Okonite, founded in 1878 to exploit a newly-developed process for insulating wire and cable with rubber, was one of the first United States companies to successfully manufacture 345,000-volt cable. Okonite is a recognized leader in the high-voltage field. It has developed and employs a number of unique processes and equipment. Its headquarters are at its Passaic, N. J., plant. It also has plants in Paterson and North Brunswick, N. J., and Providence, R. I., making a total floor area of 1,612,000 square feet on 195.24 acres of land, employing about 1,800, and with a projected total for 1965 of approximately $70,000,000.00. Substantial amounts have been spent on modernizing the plants and installing new cable-making and processing equipment in recent years.

The objections of the government to judicial approval of the LTV agreement to purchase Okonite were clearly stated in this proceeding as follows:

"First, that there are and appear to be substantial possibilities of business relations between the two firms, Okonite and LTV, which suggest, at least the questionable character of allowing this sale.

"Secondly, we think that the copper contract, the proposed copper guarantee, is not in the best interests of the competitive scene." (S.M. pp. 39–40)

The government argues that divestiture should be accomplished by "a spin-off" of Okonite and that this be done by the distribution of Okonite stock to the public either directly or through an initial distribution to the Kennecott stockholders. We will consider these objections and the proposed "spin-off" divestiture separately.

The government objects to the sale to LTV because an integral part of the agreement to purchase (and affixed to it as Annex "B") is a copper supply contract between Kennecott Sales Corporation (a wholly-owned subsidiary of the defendant) and LTV. This, it is claimed, will be detrimental to competition and will give LTV a substantial advantage over independent copper fabricators who must rely on Kennecott for their necessary copper supply.

The particular portion of the proposed copper supply contract to which objection is made reads:

"2. Seller agrees to sell to Buyer for shipment during each of the calendar years listed in the following Table, at Buyer's option exercisable as herein provided up to but not exceeding the maximum amount of electrolytic copper therein set forth with respect to such year:

| Year | Millions of Pounds |
|------|--------------------|
| 1966 | 67 |
| 1967 | 72 |
| 1968 | 75 |
| 1969 | 75 |

The maximum amount which Buyer shall so be entitled to purchase for shipment during any calendar month during any such year shall be as determined by Seller in the light of the anticipated rate of production of electrolytic copper at various times during the then current year of Kennecott Copper Corporation and any other producer or refiner from which such copper is to be obtained by Seller, but such maximum amount for any month shall not be less than ½4th or more than ⅛th of the total amount for the

then current year set forth above. Seller shall advise Buyer of the maximum amount so determined for such month not later than the 10th day of the preceding calendar month.

"Buyer shall advise Seller, not later than the 15th day of such preceding calendar month of the amount (not exceeding the maximum amount) which Buyer so elects to purchase for shipment during such calendar month. If Buyer fails so to notify Seller of its option to purchase copper for shipment in such calendar month, or if Buyer elects to purchase less than the maximum amount which it is entitled to purchase with respect to such calendar month, Seller shall be under no further obligation with respect to the amount not so ordered by Buyer. If Seller shall sell to Buyer for shipment in any calendar month an amount in excess of the maximum amount for such month as determined by Seller, such excess shall not serve to reduce the maximum amount purchasable by Buyer for shipment in any subsequent month."

All prices for purchases of copper by the new Okonite under this contract are set by paragraph "5" which fixes the so-called producer's price with the following limitations:

"5. Seller's present pricing policy is on the basis of its price and differentials prevailing on date of shipment, and the copper purchased hereunder will be priced accordingly as long as such pricing policy of Seller remains in effect. However, if Seller changes its present pricing policy to some other basis, such as price and differentials in effect on the date purchase contracts are placed, or such as E & MJ Mineral and Metal Markets average for month of shipment, the copper purchased hereunder will be priced accordingly."

■ The copper supply in this country comes to the fabricating consumer either by purchase direct from the mining or producing companies (i. e., Anaconda, Kennecott, Phelps Dodge, etc.) or from purchases in the "out-side market" in which prices are influenced or are set by dealer or exchange transactions. The price per pound fluctuates according to the available supply and the demand to be met. It is common knowledge that the copper supply, at times, falls short of the demand and the market price per pound rises. The copper producers recognized that if the requirements of their integrated fabricating subsidiaries are fully met in periods of shortage, the independent non-integrated fabricators would have to purchase at higher market prices, that this would substantially increase their costs, curtail their operations, result in loss and might force their liquidation. To retain the independent fabricators as consumers and customers in times of over-supply, the copper producers have established allocations for each customer which are of special price benefit to independent fabricators in the recurrent periods of shortage.

It has been found in this suit that the established Kennecott allocation price policy favored none and was fairly applied in the copper shortage of 1955–6, and 1959. Concerning this Judge Dawson found:

" * * * The government asserts that when copper has been in short supply, Kennecott has favored its own subsidiaries and that it will continue to do so. Evidence was received concerning the competitive situation existing during two periods of copper shortage, 1955–6 and 1959. The evidence does not support the government's contention.

"During periods of shortage Kennecott has sold its copper on an allocation system based on past purchases. Kennecott allocated copper to its own fabricating subsidiaries on the same basis as to its independent customers. It was in Kennecott's self-interest to do so. If Kennecott were to discriminate against its independent customers, it would severely

damage its own business. Dissatisfied customers would not return when the period of shortage had passed."

There has been no evidence, indeed no claim, that the Kennecott allocation price policy has not been fairly applied to all in the present existing copper shortage.

With divestiture of Okonite from Kennecott two of the large copper-producers in the United States will remain with integrated copper wire fabricating subsidiaries or divisions. They are Anaconda Copper Company, which was formed in 1929 as the Anaconda Wire & Cable Company by a series of acquisitions, and Phelps Dodge Company which acquired a copper fabricating subsidiary as a result of acquisition in 1930. These two copper-producer owned subsidiaries and the present independent fabricating companies will be among Okonite's new owner's competitors in certain areas of copper wire and cable production. Each will have an established historical allocation of refined copper with the copper producing companies ensuring them of a large percentage of the refined copper used by them in their fabricating, purchasable at "producer-prices." To start the new Okonite operations off on a competitive level with them, it must have the benefits of the historical allocation of copper from the copper producers which were extended to the old Okonite company. In the negotiations for the purchase by LTV, Kennecott orally agreed to this; however, LTV officials insisted the agreement be reduced to a writing. This gave rise to the option copper purchase agreement now challenged by the government. We observed during the hearing that the insistence of LTV upon this written copper option contract affords substantial evidence of arm's-length bargaining between Kennecott and LTV.

We accept the closing statement at this hearing of defendant's attorney (S.M. p. 671) as a fair appraisal of the evidence and of this optional copper supply contract when, referring to this contract, he said:

"Under its present allocation Okonite will buy 28,500 tons of copper from Kennecott in 1965 * * * (S.M. p. 196) * * *. And in view of Kennecott's expected increases of production, 40,000 additional tons in 1966 and 70,000 in 1967, Okonite would be entitled to higher allocations in subsequent years, approximately contract quantities of 33,500 tons in 1966, 36,000 tons in 1967 and 37,500 tons in 1968 and 1969. That is in the transcript at pages 145, 145a and 176 to 177, and in Defendant's Exhibit 1 in Annex B.

"Now, the option contract doesn't supply all of Okonite's future needs, because in 1965 Okonite bought about 35,000 tons of copper, including 6,500 tons of premium copper, and presumably its needs will be higher in future years; and the option contract contains the usual force majeure clause, but the amount of the copper in the contract is quite consistent with the amount that normally would be allocated, taking into consideration the anticipated future production, and I submit that the variation of 2,000 tons, to which Mr. Milliken testified, is not significant in a 400 thousand ton projection of Kennecott * * * The only purpose of the contract is to let LTV get adjusted, and one of the first things they would try to do would be to get a second source of supply and, as I pointed out earlier, it doesn't compel it to buy the copper, it could buy the copper wherever it could get the copper cheaper.

"In view of this small discrepancy of 2,000 tons, I just can't see the government's argument that it gives LTV any preference over anyone else.

"Now, without some kind of assured copper supply, Okonite might not be able to keep its customers who might fear that Okonite wouldn't be able to deliver the wire and cable ordered and might prefer to put their orders with more integrated companies."

The record shows that this suggestion of Okonite's need to have a copper supply contract was first advanced by the government, when in a memorandum dated

March 3, 1965 submitted to the Court, it was stated that:

"5. Kennecott should undertake to supply, at New Okonite's option, up to two-thirds of New Okonite's copper requirements for ten years after divestiture, at its best price."

Kennecott opposed and objected to the government's suggestion of a copper supply contract being given to a new spin-off Okonite company with an indefinite amount of copper based on Okonite's unknown requirements for a period of ten years. Kennecott's continued objection to such terms as tending to jeopardize the copper supply of its other customers still is formalized in the time and quantity provisions of the proposed LTV contract.

It is difficult for us to reconcile the government's present opposition to the copper supply option agreement now before us with the position it took prior to the making of the LTV purchase agreement. In an order of divestiture proposed by the government in July, 1965, it was provided that the "spin-off" Okonite company be given even broader producer price benefits for a period, not of four but for ten years. The government's position at that time was set forth in the following language:

"(D) Guarantee to supply a maximum of two-thirds and a minimum of none of New Okonite's refined copper requirements for a period of ten years from the date of New Okonite's establishment as an independent company. Such copper shall be sold by Kennecott to New Okonite at Kennecott's lowest quoted price at the time of purchase. Such sales shall be made on terms which Kennecott offers to any other buyer, the choice of terms to be that of New Okonite when there is any variation in the terms of Kennecott's sales to other buyers."

The government's attempted explanation for its present opposition to the proposed LTV supply contract is not persuasive or convincing.

The government still states that "Okonite as a separate and independent company would undoubtedly need both financing and copper supply guaranteed by Kennecott." Then, forgetting its present basic objection that it would grant to the New Okonite company an unfair competitive advantage over its nonintegrated independent fabricating competitors, the government views it when extended to a "spin-off" company as innocuous and adds that "the copper guarantee would essentially be part of the financing to be supplied by Kennecott." However, the government continues that with LTV supplying the necessary financing, if it is allowed to acquire the new Okonite company, "a copper guarantee by Kennecott to LTV becomes merely a method of discounting the LTV purchase price to the detriment of Okonite's independent competitors, and not a necessary means of keeping Okonite a viable company." It just does not "add up."

We have concluded that the new Okonite company as acquired by LTV should have its minimum annual allocations definitely stated in optional annual quantities by a four-year term contract with Kennecott in amounts reduced from those which have been agreed to in writing.

As to a modification of the copper supply contract, the government in its final brief on these hearings has said:

" * * * If, over our opposition, LTV is to be permitted to acquire Okonite, it should accept that company with its historical allotment of Kennecott's copper. In terms of percentage of producer copper available to Okonite the Kennecott allotment already gives it a significant advantage over independent companies who are forced to rely to a far greater degree on the higher-priced open market copper."

It is stated now by Kennecott that the amounts stated in the copper supply contract: 1966, 67 million pounds; 1967, 72 million pounds; 1968, 75 million pounds; 1969, 75 million pounds—"are only slight-

ly in excess of the allocation to which Okonite would be entitled, assuming the continuation of Kennecott's allocation system, on the basis of Okonite's past purchases and Kennecott's projected increases in production during the four-year option period."

The evidence shows that Okonite will buy approximately 28,500 tons of copper from Kennecott in 1965. Kennecott anticipates increases of production of 40,-000 additional tons in 1966 and 70,000 in 1967. If these increases of production are realized, with application of the present Kennecott allotment procedure, Okonite would be entitled to higher tonnage allocations for these years. The LTV management states it is its intention to establish as soon as possible new and additional sources of copper supply other than Kennecott; it should do so. It appears that a guarantee of supply, optional with LTV to annually exercise, would encourage its efforts to this, without fear that the failure of a new supplier to meet Okonite's needs would jeopardize its allocation rights with Kennecott.

■ We will approve the copper supply contract of LTV and Kennecott for the new Okonite company provided it is modified for the four-year period to guarantee to the new Okonite company at producer's price a minimum percentage of Kennecott's total copper production (including increases) equal to that given Okonite for the total calendar year 1965, with the force majeure clause still obtaining. Of course, it is recognized that if there is copper on the market adequate to meet demands, the copper supply contract loses its significance. Likewise, if Kennecott's hopes of increased production are not fully fulfilled Okonite's total allocations will not meet the amounts now specified in the proposed contract; the contrary if Kennecott's increased production exceeds the tonnage expected.

We come then to the government's objection to any sale of Okonite to LTV because there appear to be "substantial possibilities of business relations be-tween the two" which "suggests at least the questionable character of allowing this sale." We find this objection born of suspicion unsupported by evidence and without proof which would indicate any probability—reasonable or otherwise—that the sale would or might lead to a resultant horizontal or vertical merger in violation of anti-trust prohibitions.

As to the "business relations" to which objection is made, they seem limited to (a) possible sales by Okonite to LTV of wire and cable used by LTV and (b) the possibility that LTV will be in a position to increase Okonite's sales through LTV's relationships with its suppliers.

LTV's purchases from Okonite have been only about $2,000 per year. The evidence shows that LTV does not purchase or use in its production any appreciable amount of wire and cable of the types Okonite manufactures.

The purchase of Okonite by LTV is not even remotely prompted by a purpose to acquire one of its suppliers, either real or potential. LTV seeks diversification of investment and business activity by a way which is described by some as a "conglomerate" merger. Both companies clearly manufacture and sell different products, cater and deal with different customers and operate in different areas both geographically and commercially. Monopoly is not threatened with this acquisition and on the record before us there is no threat, reasonable expectation or probability of either monopoly or restraint, or the interfering with free competition in any field or market of business activity.

Other than the argument of potentiality, the government doesn't contend that the sale to LTV would violate Section 7 of the Clayton Act. It seems to reason that if LTV were to expand or LTV were to merge with somebody else, and it has had past mergers and acquisitions, that then possibly some time in the future an enlarged LTV might have an advantage over other copper and cable fabricators. If operations of the new Okonite under LTV should bring about such unlikely conditions appropriate remedies are then

available; we do not find them now present or a reasonable probability of their occurrence.

We can and will however take affirmative measures against Kennecott's future involvement in the new Okonite company and the order of approval of sale will contain injunctive provision against any interlocking directorships or officerships between Kennecott and LTV or Okonite, and against Kennecott's reacquiring any of the shares or assets of Okonite.

We have at various times during the course of the hearings expressed our views concerning the problems of a spin-off divestiture.

Okonite presently has a competent "operating management"; it does not have, nor can it support on its current volume of sales, a "top management" to give major policy guidance and decisions, the long range financial and other planning, and the engineering help which Okonite will require and which Kennecott as the parent supplied during the period when Okonite's losses were being transformed into profits. A spun-off Okonite would not have available the large financial resources which it may need to remain competitive. To require Kennecott to continue to supply funds, over an indefinite period and in uncertain amounts, would defeat the very purpose of the final judgment for it would only serve to continue Kennecott's interest in and association with Okonite.

Financially and from a management point of view, we have good reason to fear Okonite as a "spin-off" company would be faced with the same problems as it had prior to its acquisition in 1958.

In the present proceeding the government has urged, however, that Okonite in 1958 was a strong and profitable business organization and (as found at trial) "its management was young and progressive and reputed to be one of the most able in the industry," and this is so. However, it also was found at trial that

"Okonite was interested in the merger for financial reasons. It felt it had to expand to survive and that Kennecott could supply the necessary capital."

The brochure (Exhibit 69) on trial, to which reference was made by the able government trial attorney on this hearing, (S.M. p. 700) published by Okonite in 1957, discloses this acute financial problem in its balance sheets for 1955 and 1956 and in the references in the text (page 20, S.M. p. 733) to its growth problems and the need of "finding adequate growing room in terms of the physical expansion" of its plants.

It is not to be disputed that in 1958 Okonite needed larger modern additional manufacturing facilities. This would entail the expenditure of large sums; Okonite did not have the available capital and could not raise it; Kennecott did invest heavily in Okonite for improvements and expansion. Further expansion, increased facilities and plants in new market areas are essential not only to increase profitable operations but to the very survival of Okonite as a manufacturer of wire and cable independent of a copper producer. Ling-Temco-Vought, Inc. is in a position to make the required capital available and, if necessary, to lend its credit to obtain it; it has through its management expressed its intention to do so and it would have good reason to carry out that intention to protect its investment of over $30,000,000 in Okonite as its subsidiary.

On the basis of Okonite's earnings during the past five years, which are the past facts upon which the market would assess the value of a spun-off Okonite's stock, that stock would have a market value of only a fraction of the intrinsic value of the company. Without a top management in which the investing public has confidence, and without a reliable source for further financing, the market would make a very low assessment of Okonite. This could permit the buying up, in the open market, and for very little money, of a control block of Okonite stock, with the resultant possibility that the controlling stockholders might find it more profitable to liquidate

the company than to operate it. With the highly uncertain future of a spun-off Okonite, its key employees might for their own security take jobs with Okonite's competitors. Customers seeing these probable difficulties of a spun-off Okonite might well start looking for other and more certain sources of supply.

We were led to observe of the government's spin-off plan that it is unworkable because of some of the statements concerning the plan in a memorandum submitted by it under date of July 14, 1965. Among them, we found the following:

> "The establishment of New Okonite as a viable independent competitor will be a multifaceted undertaking. Plaintiff has called attention in its proposed order to several aspects of the divestiture which we consider of prime importance, but ancillary matters which do not readily lend themselves to specific treatment at this time will doubtless arise in the course of divestiture. Moreover, many specific determinations will have to be made concerning, for example, the capital structure of New Okonite, the staffing of the company, the establishment of its distribution system and the nature of New Okonite's pension program, elements of divestiture which are discussed below. The success of divestiture will depend in no small measure on how all such matters are resolved.

> "We believe that the continuing supervision and direction necessary to achieve effective divestiture can be furnished by a divestiture trustee to be appointed by the Court. Acting as agent of the Court, the divestiture trustee would direct the implementation of the Court's Order of Divestiture, report to the Court on the steps taken to that end, and recommend to the Court such further orders as may appear necessary to secure the establishment of New Okonite as an independent concern."

■ The use of a "Divestiture Trustee" acting as agent of the Court should be reserved for the very rare and very exceptional case where divestiture can be accomplished by no other possible means. This is not such a case.

■ The continued judicial supervision of the management and financial affairs of a divested business enterprise is a remedy which should be sparingly applied and then only for a specified limited time and within well-defined limits.

The government in its final memorandum submitted in this proceeding made several statements which we accept:

> "This Court has ample power to require Kennecott to provide Okonite with support sufficient to give it a fair start as a separate and independent company. We have noted in the past that Kennecott has ample resources to give Okonite sufficient financial standing as a separate and independent company. It could augment this by copper guarantees which would further serve to give Okonite a fair start as a separate and independent company. Okonite is not entitled to a guarantee of success once it is divested from Kennecott any more than it had a guarantee of success when it was a separate and independent company before the Kennecott acquisition. Thus, this Court has ample power to give Okonite everything to which it is fairly entitled."

However, to require Kennecott to give Okonite financial support which cannot be presently measured in dollars and cents would be to continue Kennecott's interest in Okonite's affairs. Approval of the sale to LTV immediately and completely severs this interest; this, we have held, should be done promptly. To require the ten-year copper supply contract for the spun-off company, would operate to continue its purchasing ties with Kennecott for a period of six years longer than that of the LTV contract of pur-

chase. While Okonite is not entitled to a guarantee of success once it is divested from Kennecott, it should not be launched as an enterprise threatened with liquidation at the end of each fiscal period or constantly threatened with probable financial and management problems when it is not necessary. With LTV's investment in Okonite of approximately $30,000,000 we have every assurance that an alert, capable organization will not idly sit by and see that investment lost through lack of effort on its part to prevent it.

An order providing for approval of the proposed sale of Okonite to LTV, upon the terms hereinbefore set forth, may be noticed for settlement before me at 2:00 p. m. on December 28, 1965 in Room 2203, at which time the parties will be heard.

